IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 7, 2006 Session

**STATE OF TENNESSEE v. ERIC LUMPKINS**

**Appeal from the Criminal Court for Shelby County**
**No. 03-08391     W. Mark Ward, Judge**

---

**No. W2005-02805-CCA-R3-CD  - Filed June 7, 2007**

---

The defendant, Eric Lumpkins, appeals from his Shelby County Criminal Court jury convictions of first degree murder, attempt to commit first degree murder, and two counts of aggravated assault. He challenges the sufficiency of the convicting evidence, the selection of the trial jury, the admission and exclusion of evidence, prosecutorial remarks made during closing argument, and his aggregate sentence of life plus ten years. We hold, *inter alia*, that the convicting evidence is legally sufficient and, in so holding, decline to apply the physical facts rule, and we hold that consecutive sentencing may be imposed by the trial judge without the participation of a jury. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Thomas E. Hansom, Memphis, Tennessee (at trial); and William D. Massey, Memphis, Tennessee (on appeal), for the Appellant, Eric Lumpkins.

Robert E. Cooper, Jr., Attorney General & Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee Coffee, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The defendant's convictions resulted from a July 19, 2003 shooting on Speed Street in Memphis.

The evidence supporting the convictions showed that Emma Thelma Tatum, the homicide victim (referred to hereafter as the "victim"), lived on Speed Street next door to Jerry Lumpkins, the defendant's father. The victim's sons, Leland Tatum and Bishop Tatum, lived in a duplex-type dwelling across Speed Street from Jerry Lumpkins. Bishop Tatum and Jerry Lumpkins

had had a frictional relationship for about two years, but none of the Tatums had previously experienced any difficulties with the defendant, Jerry Lumpkins' son.

Between 7:30 p.m. and 8:00 p.m. on the evening of July 19, 2003, while the Tatum brothers were on their front porch, the defendant, who was on his father's front porch, began taunting Bishop Tatum to fight. Leland Tatum prompted Bishop Tatum to ignore the defendant, but the defendant left his father's porch, crossed the street, and started up the steps to the Tatums' duplex. Leland Tatum told the defendant to return to his father's house, and the defendant's father, Jerry Lumpkins, came across the street to collect his son and take him back to the Lumpkins' house.

Leland Tatum testified that he told Bishop Tatum to call the police. The victim crossed the street from her home to her sons' porch, and Essie Tatum, Leland Tatum's wife, came out of Leland Tatum's side of the duplex onto the porch as well. Some of the Tatums heard Jerry Lumpkins ask one of his friends, a man named "Johnson," to drive the defendant to the house on Olympic Street that the defendant occupied with his girlfriend. The friend drove away in a red car with the defendant as a passenger. Following their departure, a police officer arrived, talked to the Tatums, learned that the defendant had departed, and after about ten minutes, the officer drove away.

Leland Tatum testified that, shortly after the officer left, Jerry Lumpkins stood outside his house talking on a portable or cellular telephone. Leland Tatum testified that he overheard Jerry Lumpkins say into the telephone, "[G]o get your gun." Bishop Tatum testified that he heard Jerry Lumpkins say into the telephone, "[K]ill everybody on the porch."

Within a few minutes, the red car reappeared on Speed Street and headed southerly toward the parties' houses; the Lumpkins' house would be on the driver side and the Tatum brothers' house on the passenger side. Both Tatum brothers testified that daylight still prevailed and that they could clearly see the defendant point and fire a pistol from the passenger window of the red car in the direction of the Tatums' porch, which was then occupied by the two brothers, the victim, and Essie Tatum. The Tatums scrambled to get inside the duplex units. As the car moved slowly down the street and past the Tatum duplex, the defendant fired a total of five shots, the fourth of which struck the victim in the right buttock as she was "pushing" Bishop Tatum into the dwelling. Bishop Tatum testified that the victim was "still standing" when she got shot and that she bent over after she was shot. The Tatum brothers both testified that the car turned at the next corner and stopped; from that location, the defendant fired a sixth shot toward the Tatums' porch. All three of the surviving Tatums testified that none of them possessed a gun during the evening of July 19, 2003.

Harry Johnson testified that on the evening of July 19, 2003, he drove a red, four-door Oldsmobile Cutlass to Speed Street to visit some relatives. He parked near the residence of Jerry Lumpkins. He had known Jerry Lumpkins for many years, since they attended school together. Mr. Johnson testified that Jerry Lumpkins asked him to drive the defendant home, and Mr. Johnson took the defendant to a house on Olympic Street. After the defendant went inside the house and before Mr. Johnson could pull away, a girl came out and told Mr. Johnson that the defendant had forgotten something and needed a ride back to his father's house. The defendant got into Mr. Johnson's front

passenger seat and fully reclined the seat. Mr. Johnson neither saw a gun nor suspected that the defendant had one. The defendant seemed "tense" and "stressed out." When they arrived on Speed Street and Mr. Johnson prepared to back into a parking space near the Lumpkins and Tatum houses, the defendant sat up and told him not to bother with parking. Mr. Johnson testified that "gunfire erupted." He did not initially perceive from where the gunfire came. He testified, "I ducked . . . [b]ecause I'm scared from my experiences in Vietnam." He realized the defendant was firing a gun after the defendant had fired about five times and pulled a large-caliber, blue-steel revolver with a six-inch barrel back inside the car. The defendant then grabbed the steering wheel and pressed his foot on the accelerator, saying "Pull off fool." Mr. Johnson testified that the defendant assumed control of the vehicle and drove it back to Olympic Street, where before getting out of the vehicle, the defendant told Mr. Johnson, "You don't know nothing and don't want to know nothing." Mr. Johnson testified that he had not been charged with any offenses.

The parties stipulated that the victim died on September 13, 2003, as a result of a gunshot wound she sustained in her pelvis on July 19, 2003. Doctor O. C. Smith, the Shelby County medical examiner, testified to the same effect. He elaborated that the bullet entered the victim's right buttock and lodged in her left hip joint, breaking the joint. He explained that had the bullet entered the victim's body when she was standing erect on both feet, its relative line of travel through her body was from right to left, back to front, and down from the point of entry to the left hip joint. Doctor Smith stated that too many unknown variables prevented him from opining whether the gun must have been fired from an elevation higher than the victim's entry wound. The doctor acknowledged that the bullet could have first struck an inanimate object and deflected into the victim's body.[1]

On cross-examination, however, Dr. Smith agreed with defense counsel that unless a bullet's energy was nearly expended, its path would not "normally" be altered as it traveled through human tissue, and in the victim's case, the bullet was not near the "end of its travel" when it struck the victim, as indicated by the fracture to the left hip joint. Doctor Smith also agreed that a hypothetical involving the victim's wound as described in his testimony, her location on a porch above the street, and a shot fired from the street was "difficult to resolve." He added that, if the victim were standing erect when she was shot, the path of the bullet through her body would be more easily "achieved" if the gun were positioned at the altitude of or above the entry wound.

Nevertheless, he testified that this latter hypothetical or explanation was "one amongst several that could explain the path of the wound through the body." The doctor opined that permutations in the positioning of the victim's body, such as her being "canted over" to the rear, having a leg off the ground, or her crawling with her feet angled away from the shooter could reconcile the victim's wound with a shot from the street below her. He stated that he could not discern within any degree of medical certainty the "position or what level the shooter must have been for [the victim] to sustain that wound."

---

[1] The bullet was recovered from the victim's body by a surgeon and was submitted to the Tennessee Bureau of Investigation for analysis. Nevertheless, the State offered no evidence about the characteristics of the bullet.

The defendant neither testified nor offered any other direct evidence.  The jury convicted him of the premeditated first degree murder of the victim, of attempt to commit the first degree murder of Bishop Tatum, and of the aggravated assaults of Leland Tatum and Essie Tatum. The jury imposed a life sentence in the homicide, and the trial court imposed a sentence of 23 years for the attempted homicide, to run concurrently with the life sentence.  It imposed sentences of five years for both of the aggravated assaults, to run consecutively to each other and to the effective life sentence.  The arrangement yielded an effective sentence of life plus ten years.

## I.  Sufficiency of the Evidence

In his first issue, the defendant claims that the evidence is insufficient to support the convictions.  He argues that the path of the gunshot wound through the body and the evidence that illustrates that the victim was "upright" when she was shot belie the State's claim that the lethal shot was fired from the defendant's level on Speed Street.  He relies upon the "physical facts rule" in imploring this court to reject the testimony of the Tatum brothers and Harry Johnson that identified the defendant as the shooter.  The result, he claims, is that all four convictions must be set aside, and the underlying charges must be dismissed.  We are not persuaded.

The standard for an appellate court when reviewing a challenge to the sufficiency of the evidence is "whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002); *see also* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2791-92 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).  Because a verdict of guilty removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict.  *See State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.  *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000); *see also Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599.

A verdict of guilty by the trier of fact resolves all conflicts in the evidence in favor of the prosecution's theory.  *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).  "Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence." *Evans*, 108 S.W.3d at 236 (citing *Bland*, 958 S.W.2d at 659).  Nor may this court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact.  *Id.* at 236-37.  The supreme court articulated the rationale for this rule as follows:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and

-4-

> credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

The "physical facts rule" has been explained as "the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded." *State v. Hornsby*, 858 S.W.2d 892, 894 (Tenn. 1993). The rule comes into play when "the testimony of a witness 'cannot possibly be true, is inherently unbelievable, or is opposed to natural laws,' [so that] courts can declare the testimony incredible as a matter of law and decline to consider it," *id.* (quoting *United States v. Narciso*, 446 F. Supp. 252, 282 (E.D. Mich. 1977)), and when "'undisputed physical facts are entirely inconsistent with and opposed to testimony,'" *id.* (quoting *Wood v. United States*, 342 F.2d 708, 713 (8th Cir. 1965)). A high threshold, however, must first be surmounted to apply the rule. "We caution," wrote the supreme court in *Hornsby*, "that the power to disregard oral testimony because of its inherent lack of believability is one that should be used sparingly." The court continued,

> Only when the testimony is inherently improbable and impossible of belief should courts intervene to declare it incredible as a matter of law. When the testimony is capable of different interpretations, the matter should be left for the jury to decide as the sole arbiter of credibility. Deciding whether there are inconsistencies in testimony, reconciling conflicts in testimony, and how this might affect a witness's credibility, are all within the province of the jury. As the court observed in *Smith v. Steele*, 44 Tenn. App. 238, 313 S.W.2d 495 (Tenn. App. 1956), "the improbability of the truth of the testimony, which justifies rejection under the physical facts rule, cannot rest upon any theory involving the consideration of the comparative credibility of the witnesses." *Smith* at 508.

*Hornsby*, 858 S.W.2d at 895-96 (citations omitted).

One commits first degree murder who premeditatedly and intentionally kills another. T.C.A. § 39-13-202(a)(1) (2006). One attempts to commit first degree premeditated murder when he or she, acting with the culpability required in Code section 39-13-202(a)(1) and intending to kill another, believes the conduct will kill the other person without further conduct on the actor's part. *Id.* § 39-12-101(a)(2). As alleged in the indictment, aggravated assault is committed by one who intentionally or knowingly causes another to reasonably fear imminent bodily injury and uses or displays a deadly weapon. *Id.* § 39-12-101(a)(2), -102(a)(1)(B).

We may not usurp the role of the jury by applying the physical facts rule in the present case to set aside the first degree murder conviction. To be sure, the defense was able to exploit the testimony of Dr. Smith to demonstrate the incongruity between the bullet's path through the body of an erect victim and the defendant's location in a car on the street below, and the defense extracted cross-examination testimony from Bishop Tatum that the victim was standing when she was shot. Nevertheless, Dr. Smith pointed out that he could form no opinion about the location of the shooter; permutations of time and space governed primarily by the movements of the victim on the porch could have explained how the gunshot wound was consistent with the State's theory. Thus, we cannot say that the facts demonstrated the physical impossibility that the defendant shot the victim.

Additionally, we point out that the jury may have reasonably inferred that Bishop Tatum's testimony about the victim's posture was not dispassionate clinical information, given the chaos that resulted when the opening shots were fired. Furthermore, the records reveals no basis for inferring that anyone other than the defendant possessed or fired a gun during the episode.

Thus, the evidence in this case presented a jury question on the issue of who shot the victim, Emma Thelma Tatum. *A fortiori*, the evidence showed that the defendant fired the shots that resulted in the other three convictions. Apart from the Tatum brothers' testimony that a shot fired by the defendant struck their mother, Mr. Johnson testified that the defendant fired a number of shots from the car window while in the vicinity of the Tatum's duplex, bolstering the testimony of all three Tatums that they were victimized by the barrage of gunfire. Thus, the evidence sufficiently supports all four convictions.

In so holding, we are obeying the fundamental rule that we leave credibility determinations and inferences of fact to be settled by the trier of fact. We are not unaware that conflicts attended the evidence in the case. For instance, in their testimony, Leland Tatum and Bishop Tatum differed as to whether the red car was parked on the street before Leland Tatum and his wife arrived, who between them called the police the first time, whether the Johnson car had two or four doors, and whether the pistol used by the defendant was "silver chrome" or "a black gun." Mr. Johnson testified that the defendant's pistol was "blue steel," and he contradicted the Tatum brothers concerning the make of the red car, whether the car stopped after it turned off Speed Street at the corner, and whether the defendant fired a sixth shot from around the corner. Also, although the Tatums testified that the shooting occurred during daylight around 8:00 p.m., the officer who first answered both dispatch calls to Speed Street on the evening of July 19, 2003, testified that it was dark when he went to the Tatum duplex both times, that the dispatcher received the shooting call at 9:00 p.m., and that he arrived in response to this second call at 9:06 p.m. Nevertheless, the trier of fact in our system, not the appellate court, resolves factual inconsistencies and disputes. Because testimony was presented that, if believed, established the elements of the offenses, the verdicts are legally supported.

## II. Failure to Strike the Venire

In his next issue, the defendant claims that the trial court erred in denying his motion to strike the venire. The issue results from the voir dire examination of prospective juror Brenda Echols. During jury selection, Ms. Echols was called forward from the jury pool to be examined, and the trial court initially asked her, "Is there any reason why you can't be on this jury?" When she responded affirmatively and the trial court asked her to explain, she said, "My brother was killed in 1999 right at the corner of Speed and Jackson by a Lumpkin. I don't know if that's his first offense but Lewis Lumpkin was the father of the Lumpkin person." The trial court instructed Ms. Echols to say no more and immediately excused her from the venire.

Defense counsel immediately moved to strike the venire on the basis that Ms. Echols' comments would influence the trial jurors. In light of proof to be presented in the defendant's case that the shooting occurred on Speed Street, defense counsel expressed concern that Ms. Echols had referred to Speed Street as the site of a 1999 homicide committed by someone named "Lumpkin." Counsel argued, "[T]his is a remark that you can't instruct out of." The State responded that the proof would show that the defendant's father is Jerry Lumpkins, not Lewis Lumpkins. The trial court denied the defendant's motion to strike the venire and instructed the jury,

> Ladies and gentlemen . . . , you just heard some comments by . . . Ms. Echols, that . . . I don't want you to be considering . . . . Actually, I want you to put them our of your mind. You cannot consider any of the comments that Ms. Echols just made in this matter at all. And furthermore, I want you to know for the record that whoever that Lumpkins was that she was referring to is not related to this defendant in any way whatsoever. And, obviously, it's not the defendant nor any relation to him and it's pure coincidence that she happened to know a Lumpkin [who] lived somewhere near the Speed address. But, but, you do need to know, I'm telling you just to put it out of your mind. I am telling you to put it out of your mind but it simply is not true. And, you need to know that [neither] this defendant nor any member of his family was involved in anything like that.

After the jury pool was sworn but prior to the court's dialogue with Ms. Echols, the court had informed the jury pool that jurors must be "as free as humanly possible from any form of bias, prejudice or sympathy for either side" and must "keep an open mind until . . . when it's time to decide the case itself." The court also informed the jury pool that the "State must prove each element of a crime beyond a reasonable doubt. If you find the State has not proven every element beyond a reasonable doubt then you must find the defendant not guilty." Following jury selection, the trial court further instructed the trial jury, "[I]t is your job to determine what the facts are from the evidence. You must then apply the law and [m]y instructions to the facts. And from that application you will arrive at a verdict," adding "[y]ou must base [your] decision only on the evidence in the case and [the court's] instructions."

"[W]hen it has been shown that a juror was exposed to extraneous prejudicial information or subjected to improper influence, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or demonstrate that it was harmless." *Walsh v. State,* 166 S.W.3d 641, 647 (Tenn. 2005). Assuming for the sake of argument that this rule applies to *prospective* jurors, we nevertheless have no difficulty in discerning that the record affirmatively reflects the harmlessness of Ms. Echols' comments made in the hearing of the other prospective jurors.

Although the defendant's surname is "Lumpkins" and the site of the criminal episode was Speed Street, Ms. Echols' comments about a "Lumpkin" killing her brother on Speed Street in 1999 were expediently tempered by her statement that the 1999 shooter's father was Lewis Lumpkin (or Lumpkins). The trial jury would soon learn that the defendant's father was *Jerry* Lumpkins. Thus, as the trial unfolded, the jury would have no basis for attributing a 1999 homicide to the defendant. Moreover, the trial evidence would show that Ms. Echols' brother was not killed on the same block of Speed Street where Jerry Lumpkins and the Tatums lived. Although the better practice would have been for the court to have polled the prospective jurors following the trial court's admonishments to them, thereby ascertaining their comprehension of and compliance with the admonition and, ultimately, their impartiality, we are struck that the trial court acted promptly and vigorously to offset any influence emanating from Ms. Echols' remarks. The court explicitly informed the jury that the defendant was not involved in the homicide of Ms. Echols' brother.

We also note that the information imparted to the jury pool prior to voir dire and the preliminary instructions given to the trial jury immediately following their swearing in should have further abated any effects of Ms. Echols' statements. In sum, the record shows that, in view of the evidence adduced at trial, Ms. Echols' comments were actually self-purging of any contamination, and in any event, the trial court took effective antiseptic action.

We hold that Ms. Echols' comments occasioned no reversible error in the trial court's utilization of the then available venire.

### III. Leland Tatum's Testimony

During his testimony in chief, Leland Tatum testified that he quit his long-tenured job when he discovered, following his mother's death, that a coworker was related to the defendant. The defendant now posits that the State had no "justifiable basis for this tactic."

Despite his displeasure with Leland Tatum's testimony, the defendant cited to no authority to support the claim that the remark, either alone or in combination with any other trial event, equated to reversible trial error. For this reason, the claim is waived on appeal. *See* Tenn. R. Ct. Crim. App. R. 10(b) (stating that issues not supported by citation to authorities "will be treated as waived").

## IV. Limiting of Defense Cross-Examination

In his next issue, the defendant points to the trial court's ruling to limit his cross-examination of a police-officer witness. The officer who arrested the defendant testified that he advised the defendant of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). On cross-examination, defense counsel inquired, "And, you asked him whether or not he did this, didn't you?" The State objected on the bases that the question elicited a self-serving and irrelevant response and that any probative value would be outweighed by prejudice to the State. The trial court agreed with the State, concluding that ordering or allowing a response to the question would permit the defendant "artfully" to inject his exculpatory statement into the evidence without testifying. The court stated that any relevance of the prospective answer would be "far outweighed by the danger of unfair prejudice and confusion." The court instructed the jury to disregard the question posed to the officer.

Rulings on the issue of the relevancy of proposed evidence and whether relevant evidence is sufficiently probative to be admissible, *see* Tenn. R. Evid. 401, 402 & 403, are reviewed by the appellate court for an abuse of discretion, *see State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006); *State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

Generally, "[T]he self-serving declarations of a criminal defendant are not admissible." *State v. King*, 694 S.W.2d 941, 945 (Tenn. 1985); *Moon v. State*, 146 Tenn. 319, 242 S.W. 39, 54 (1921). Thus, to the extent that the trial court was on target in excluding a self-serving, extrajudicial, exculpatory statement made by the defendant, the trial court did not abuse its discretion.

The defendant argues on appeal, however, that rather than trying to elicit his own self-serving statement through the testimony of the arresting officer, he "sought merely to establish that he did not refuse or decline to submit to questioning by the officers." The defendant sails no better, however, by tacking in this direction. Even if he could establish that testimony that he did not refuse to submit to questioning was relevant, he failed to ripen the issue for appellate review by seeking a proffer of the sought-after evidence. *See* Tenn. R. Evid. 103(a)(2). We do not know what the officer's answer to the proposed question would have been. Thus, the defendant may not predicate error based upon the trial court's exclusion of the evidence. *See* Tenn. R. Evid. 103(a).

## V. Denial of Defense Request to Explore Claim that the State Failed to Investigate Information that Someone Other than the Defendant Shot the Victim

During his cross-examination of Bishop Tatum, the defendant tried to impeach the witness by inquiring about his prior testimony in a bond hearing. Specifically, the defendant asked Bishop Tatum whether he had been asked and then had responded in the bond hearing as follows:

[defense counsel reading from the bond hearing transcript]

Q And, can you tell the Court, please, what threats were made to you
by Jerry Lumpkins?

A [by Bishop Tatum] Jerry told me he's sorry he shot my mother
but he say he didn't mean to shoot her.

The State objected when the defendant asked to have the transcript of Bishop Tatum's bond hearing testimony exhibited to Bishop Tatum's trial testimony. A lengthy jury-out hearing followed. Much of the discussion centered around the uncertainty about to whom Bishop Tatum – or Jerry Lumpkins, for that matter – was referring in using the pronoun "he" as the shooter in the statement attributed to Jerry Lumpkins. The hearing culminated in the defendant's withdrawal of the proposed exhibit and his counsel's statement, "I am going to leave it, I think it's going to have to be argued to the jury." When the jury returned to the courtroom, the trial court instructed them "to disregard any of the questions and answers that were directed to this last witness that were given to you after . . . the question was asked, have you ever told anyone else that the defendant's father shot your mom and to which he responded, no."

Later in the trial, however, the defendant asked the trial court for leave to compel the prosecuting attorney or a subordinate to testify that the State knew that Bishop Tatum had made this attribution to Jerry Lumpkins. On appeal, the defendant says that, through this means, he wanted to demonstrate that the State neglected to investigate the possibility that Jerry Lumpkins shot the victim. The trial court ruled that any probative value of such testimony would be substantially outweighed by the danger of unfair prejudice.

We are unpersuaded that the trial court erred in denying the defendant's bid to call the prosecuting attorney or a subordinate to testify. Initially, we see that the defendant eschewed the opportunity and invitation of the trial judge to propose Jerry Lumpkins' reputed admission – either through or independent of Bishop Tatum's prior sworn statement – as substantive evidence that someone other than the defendant shot the victim. The failure to propose such evidence may have been guided by the risk that the jury might have inferred that Jerry Lumpkins implicated the defendant in the shooting of the victim. As the trial judge noted, "it could go both ways." Regardless, we are unconvinced that the State's awareness of Bishop Tatum's bond hearing testimony was relevant, and moreover, we discern no abuse of the trial court's discretion in determining that the probative value of the proposed testimony was substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403.

## VI. The State's Closing Argument

The defendant challenges the following portion of the prosecutor's closing argument:

[Y]ou can't even consider those lesser included offenses[s] unless
you find it beyond a reasonable doubt that he's not guilty or have a

reasonable doubt thereof before you can start considering lesser included offenses . . . . His guilt on [the charged offenses] is clear, it's convincingly clear . . . . I think I may have used the term inescapably clear.

On appeal, the defendant argues that the argument diminished the State's burden of proving its case beyond a reasonable doubt and "minimize[d] the significance and importance of lesser included offenses in the jury's deliberative process . . . ." The State counters that the defendant has waived the claim because he made no contemporaneous objection, that Tennessee law authorizes "sequential" jury instructions, and that the trial court correctly and adequately instructed the jury on the State's burden of proof.

We address the procedural issue first. The defendant concedes that he made no objection when the prosecutor made the challenged statements in the closing argument. Accordingly, the claim has been waived. *See State v. Smith*, 42 S.W.3d 101, 112-13 (Tenn. Crim. App. 2000); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). Appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Although the defendant did not properly preserve the issue, this court may of course consider plain error upon the record pursuant to Tennessee Rule of Criminal Procedure 52(b); however, before an error may be so recognized, it must be "plain" and must affect a "substantial right" of the accused. The word "plain" is synonymous with "clear" or equivalently "obvious." *United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 1777 (1993). Plain error is not merely error that is conspicuous but is especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. *See State v. Wooden*, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983). In *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994), this court defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense, and . . . constitutional in nature." In that case, this court established five factors to be applied in determining whether an error is plain:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused [must not have waived] the issue for tactical reasons; and

-11-

(e) consideration of the error must be "necessary to do substantial justice.

*Id.* at 641-42 (footnotes omitted). Our supreme court characterized the *Adkisson* test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error. *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000).

Trial courts have substantial discretion in determining the propriety of closing argument. Although counsel is generally given wide latitude, courts must restrict any improper argument. *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978). Generally, closing argument "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978). To merit a new trial, however, the argument must be so inflammatory or improper as to affect the verdict. *Harrington v. State*, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (Tenn. 1965). In *Judge v. State*, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this court articulated the factors to be considered in making that determination:

(1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]

(2) [t]he curative measures undertaken by the court and the prosecution[;]

(3) [t]he intent of the prosecutor in making the improper statements[;]

(4) [t]he cumulative effect of the improper conduct and any other errors in the record[; and]

(5) [t]he relative strength or weakness of the case.

*Id.* at 343.

The defendant compartmentalizes the challenged argument into two rubrics: (1) the prosecutor generally diminished the State's burden of proof by commenting that the jury could not consider lesser included offenses unless it found "beyond a reasonable doubt that [the defendant was] not guilty" of a charged greater offense; and (2) the prosecutor minimized the importance of lesser included offenses by advocating a sequential approach whereby the jury considers and disposes of the greater offenses without considering lesser included offenses unless it acquits on the greater offenses.

-12-

First, we review the awkward-at-best comment that the jury should not look at lesser included offenses unless it found beyond a reasonable doubt that the defendant was "not guilty" of a charged greater offense. First, we notice that the unfortunate comment was part of the prosecutor's narrow discussion of the lesser included offense issue and was not a broad comment upon the State's burden of proof or the defendant's rights of due process. Next, we realize that the trial court gave no curative instruction directed toward the specific comment, but of course, the defense did not contemporaneously raise the issue and afford the trial court to opportunity to cure. Third, we are confident the comment was a slip of the tongue and not calculated to thwart the defendant's rights of due process. Fourth, the comment was brief, not repeated in the argument, and we have gleaned no other errors from the record to accumulate with the closing-argument misstatement. Finally, we consider the comment in the context of strong evidence supporting the State's theory of guilt. Thus, pursuant to *Judge*, the comment was not so inflammatory or improper as to affect the verdict. Having reached this conclusion, we cannot conclude that noticing plain error is necessary to do substantial justice.

Concerning the prosecutor's bent toward lesser included offenses, we hold that the comments cannot be plain error because they were not improper. Tennessee law generally authorizes trial courts to address lesser included offenses through "sequential" jury instructions. *See*, *e.g.*, *State v. Mann*, 959 S.W.2d 503, 521 (Tenn. 1997); *State v. Raines*, 882 S.W.2d 376, 382 (Tenn. Crim. App. 1994). The comments, therefore, do not breach a rule of law and do not adversely affect a substantial right of the defendant.

Consequently, we hold that no reversible error attends the challenged closing argument.

## VII. Consecutive Sentencing

In his final issue, the defendant claims that the imposition of consecutive sentencing violated his Sixth Amendment right to jury trial. The defendant argues that *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), and *Cunningham v. California*, ___ U.S. ___, 127 S. Ct. 856 (2007), invalidate the statutory scheme under which the defendant was sentenced by the trial judge.

Although *Blakely* and *Cunningham* curtail a trial judge's statutory authority to impose a sentence in excess of the statutory maximum, *see Blakely*, 542 U.S. at 303-04, 124 S. Ct. at 2537; *Cunningham*, ___ U.S. at ___, 127 S. Ct. at 864-65, we hold that the defendant's right to jury trial was not violated when the trial court, acting without a jury, imposed consecutive sentences.

This court has determined that the Sixth Amendment allows a trial court to decide whether to impose consecutive sentences. *See State v. Howard Walter Thomas*, No. E2003-02090-CCA-R3-CD, slip op. at 40 (Tenn. Crim. App., Knoxville, Mar. 30, 2005), *perm. app. denied* (Tenn. 2005); *State v. Earice Roberts*, No. W2003-02668-CCA-R3-CD, slip op. at 15 (Tenn. Crim. App., Jackson, Nov. 23, 2004), *perm. app. denied* (Tenn. 2005); *State v. Lawrence Warren Pierce*, No.

M2003-01924-CCA-R3-CD, slip op. at 16 (Tenn. Crim. App., Nashville, Nov. 9, 2004), *perm. app. denied* (Tenn. 2005); *State v. Ira Ishmael Muhammed*, No. E2003-01629-CCA-R3-CD, slip op. at 22 (Tenn. Crim. App., Knoxville, May 10, 2004); *see also People v. Sykes*, 16 Cal. Rptr. 3d 317, 327 (Cal. Ct. App. 2004). We see nothing in *Cunningham* that contradicts this determination.

Accordingly, we reject the defendant's constitutional challenge to his consecutive sentencing.

## VIII. Conclusion

The record supports the convictions in the present case, and the order of consecutive sentencing does not abridge the Sixth Amendment. Therefore, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE